UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS RUGGIERO,              )
                             )
          Plaintiff,         )
                             )
                             )   CIVIL ACTION NO.
     v.                      )   13-12962-DPW
                             )
AMERICAN UNITED LIFE         )
INSURANCE COMPANY; and       )
ONEAMERICA FINANCIAL         )
PARTNERS, INC.,              )
                             )
          Defendants.        )

MEMORANDUM AND ORDER
September 30, 2015

Thomas Ruggiero, an insurance agent, brought this action against American United Life Insurance Company and OneAmerica Financial Partners, Inc., alleging that the defendants misclassified him as an independent contractor in violation of Mass. Gen. Laws ch. 149, § 148B, and accordingly violated two Massachusetts wage laws.

Ruggiero now moves for summary judgment on Count I of his complaint, alleging improper classification as an independent contractor. For their part, the defendants move for summary judgment on all three counts of the complaint, contending summary judgment should be granted in their favor on Count I and then it should also be granted as to the additional counts

1

because the identified wage laws do not apply to independent contractors.

## I. BACKGROUND

### A.  *Factual Background*[1]

#### 1.  The Parties

Prior to his relationship with AUL, Ruggiero was an insurance agent for approximately 25 years for AXA Equitable Life Insurance Company, a competitor of the defendants.  During his tenure at AXA, Ruggiero served as an agency manager, responsible for recruiting and training insurance agents; sold insurance and annuity products that are regulated by federal securities law; and sold other AXA products exclusively.  He

---

[1] I note the parties respectively allude in their submissions to evidentiary challenges, although neither party has filed a motion to strike.  Ruggiero draws many of his asserted facts from the OneAmerica Enterprise Handbook.  However, American United Life Insurance Company maintains that this handbook is not distributed to general agents, agents, or brokers, and is provided only to AUL employees.  Because the relevance of the handbook is disputed and no adequate foundation has been laid for its admissibility, I will not consider its contents.

For his part, Ruggiero challenges the admissibility of the testimony of Barry Gritton, submitted by affidavit and through deposition, on the basis that Gritton lacks personal knowledge of AUL's general agent relationships.  I am satisfied that Gritton has sufficient personal knowledge to support his testimony.  Gritton served as the Vice President of Agency Distribution from 2008 through 2012.  In that capacity, he would have had direct knowledge of Ruggiero's relationship with AUL.

also developed a client base of over 200 clients, most of whom were based in New York.

OneAmerica Financial Partners, Inc. ("OneAmerica") is a network of companies that provide financial and insurance products, including retirement plan products, individual life insurance and annuities, long-term care insurance, and employee benefits insurance and annuities.  American United Life Insurance Company ("AUL") is a mutual life insurance company based in Indianapolis, Indiana, that is a subsidiary of OneAmerica.  AUL is licensed and authorized to conduct life insurance business in every state but New York, and in the District of Columbia.  Among the functions that AUL employees perform are underwriting, setting premium rates for insurance policies, designing and drafting policy language, obtaining regulatory approval for the insurance products, investing the policy premiums, performing actuarial calculations, and administering the policies and products AUL offers.

AUL does not engage in the retail sale of its policies. Instead, AUL and its affiliates authorize insurance agents and brokers, banks, credit unions, brokerage and investment firms, and insurance wholesalers to distribute these products.  An individual can learn about AUL's products on the OneAmerica website or through OneAmerica's toll-free number, and from there

3

will be directed to a "financial professional" in a regional office for purchasing.

Among its retail sales and distribution methods, AUL works with a network of general agents and career agents.  The parties dispute whether these agents were the primary vehicle for the sale of AUL's insurance and annuity products during the parties' relationship.  General agents agree to sell AUL's products on a non-exclusive basis and recruit other agents (career agents) and brokers to work under them.[2]  Recruited career agents and brokers must be authorized by AUL to sell its products.  General agents are eligible for bonuses and agency maintenance allowances based on the number of agents they recruit, and receive "override commissions" for their own sales of AUL products and those of the agents under their supervision.

AUL has a unit staffed with three vice presidents and other employees who manage the relationships with general agents to make it "as easy as possible" for them to sell AUL products. Through this unit, AUL provides general agents with information and marketing materials regarding its products, offers "various

---

[2] The primary differences between career agents and preferred brokers are the commission rates and benefits available to them. These differences are irrelevant to the issues before me.

4

volume-based financial incentives," and invites general agents
to attend annual meetings and participate in trainings.

>    2.    The Agreement Between the Parties

In 2008, Ruggiero prepared a business plan to establish his
own insurance agency.  In early 2009, he contacted AUL about the
possibility of signing on as a general agent and managing his
own agency.  At the time, AUL was seeking to expand its presence
and reputation in New England.

Ruggiero signed a General Agent's contract with AUL on
February 1, 2009 with the purpose of establishing and building
an agency in Boston that would sell AUL products.[3]  The parties
agree — although the contract does not reflect — that Ruggiero
became both a general agent of AUL and a registered
representative of OneAmerica Securities, Inc. ("OAS"), an AUL
subsidiary that is licensed as a broker-dealer by the SEC to
sell securities.  Registered representatives must comply with

---

[3] Although the contract contains a choice of law provision
stating that "[t]his agreement shall be interpreted in
accordance with the laws of the State of Indiana," such a
provision does not apply to statutory — as distinct from
contractual — claims.  *See Jacobson* v. *Mailboxes Etc. USA, Inc.*,
646 N.E.2d 741, 746 n.9 (Mass. 1995); *see also Vertex v.
Paradigm Biodevices, Inc.*, 390 F. App'x 1, 2 (1st Cir. 2010).
In any event, I need not engage in a choice of law analysis,
because it appears that Indiana courts would permit the pursuit
of this statutory claim, and the parties do not dispute that.
Mass. Gen. Laws ch. 149, § 148B applies to Ruggiero as a
Massachusetts resident.

certain written policies issued by OAS's compliance department pursuant to federal securities laws.

Thereafter, Ruggiero established Ruggiero Insurance and Financial Services LLC ("RIFS").  The business cards, website, letterhead, and e-mail signature for his agency all identified it as affiliated with AUL; AUL contends that this identification was required for compliance with regulatory standards for the sale of securities.  Concurrent with the contract, AUL lent Ruggiero $80,000 to assist him in developing his agency.  AUL and Ruggiero also entered into a Cash Flow Amendment, pursuant to which AUL agreed to pay Ruggiero $150,000 to help him sustain his agency.  This Amendment was later replaced with a term promissory note of the same amount.

Under the contract, Ruggiero was to "recruit, train, and supervise agents and brokers" for AUL in Massachusetts "without exclusive representation," to supervise these agents and brokers, and to "solicit applications for AUL's individual and group life, health, and annuity policies and contracts, both personally and through the efforts of his agents and brokers." AUL would pay Ruggiero "overriding commissions and service fees" on insurance and annuity policies and contracts issued by AUL and secured by either Ruggiero himself "or his agents or brokers," and on policies and contracts serviced by Ruggiero or

his agents or brokers, as well as "allowances[,] . . . writing commissions, bonuses, and service fees." The contract classified Ruggiero as an independent contractor and conferred on him freedom "to exercise independent judgment as to the time, place, manner, and means in which he carries out his duties and responsibilities," and required him to pay his own expenses for maintaining an office.

By the terms of the contract, Ruggiero was not permitted to "act as a General Agent, Agency Manager, or hold a full-time contract with any other life insurance company," or to "enter into an employment contract or agreement with any individual or organization . . . without the prior written approval" of AUL. However, according to AUL, all of the third parties that distribute AUL's insurance products – including general agents – are free to sell the products of other life insurance companies, and indeed most general agents have contractual relationships with other insurance companies. Although Ruggiero was also free to sell non-AUL securities, those sales were processed through OAS as Ruggiero's broker-dealer.

During his relationship with AUL, Ruggiero freely maintained relationships with numerous other insurance companies without express permission from or disapproval by AUL. Ruggiero previously had been authorized to sell the products of more than

7

25 insurance companies in Massachusetts and more than 15
insurance companies in New York and other states.  During the
effective term of his contract with AUL, Ruggiero entered into
agreements with Crump Life Insurance Services, an insurance
wholesaler representing over one hundred insurance carriers
other than AUL, to sell its products; at least one other
insurance company to act as a general agent; and a consulting
company to act as a Chartered Federal Employee Benefits
Consultant.[4]  Ruggiero never asked AUL for permission to enter
into agreements with any of these insurance or brokerage
companies, nor does AUL believe that by doing so Ruggiero
violated his contract with AUL.

Ruggiero also recruited and trained approximately thirty
agents during his contract term with AUL.  Ruggiero's career
agents were required to enter into contracts with AUL to sell
its products.  They also established relationships with and made
sales through other insurance companies, including Crump, at
Ruggiero's direction.  Some of the agents Ruggiero recruited had
their own businesses or performed their work out of their own
offices.  Ruggiero's agents received a guide he prepared that

---

[4] Ruggiero disputes that he signed on as a general agent with
other companies, but acknowledges that he entered into a
contract that designated him as a "general agent" with at least
one particular company.

8

instructed them to sell all non-AUL, non-securities products through Crump and set forth a variety of policies for agents, including working hours, vacation, and dress code policies.

During his relationship with AUL, Ruggiero received commissions from AUL, OAS, and Crump on the sales of these products by him and the agents he supervised, as well as agency maintenance and developmental allowances from AUL.[5]  Although the parties have not offered a precise breakdown of the sales of Ruggiero's agency, it is clear that a significant portion of them were of non-AUL products, including non-AUL securities.[6] Ruggiero's personal client base during this period was almost

---

[5] Some of AUL's products are securities.  The parties appear to dispute whether Ruggiero sold any AUL securities during his contract term.  It is undisputed, however, that Ruggiero received commission payments through OAS for the sale of non-AUL securities.  Under federal securities law, Ruggiero could receive compensation for the sale of securities only from OAS, the broker-dealer with which he was registered.

[6] The record contains commission data reports for the sale of all AUL products and non-AUL securities, but Ruggiero has not submitted data on his agency's sales or commissions for non-AUL non-securities.  Accordingly, it is not possible to identify the percentage of sales or commissions by Ruggiero's agency attributable to AUL products versus non-AUL products.  As to the commission data available, the parties dispute the factual conclusions that can be gleaned, as well as the import of these conclusions.  This data was the subject of supplemental briefing following the hearing on the summary judgment motions.  In response to the briefing I directed, the defendants filed a motion, Dkt. No. 80, for leave to file an additional affidavit. Because the proposed affidavit clarifies the earlier affidavit, but does not offer any new evidence requiring further development of the record, that motion will be allowed.

exclusively – 95%, by his testimony – in New York, a state in
which AUL products could not be sold.  As a result, over 95% of
the products Ruggiero personally sold during his contract term
with AUL were non-AUL products.  As for Ruggiero's agents, the
record shows that some agents earned more in commissions on the
sale of AUL products than on the sale of non-AUL securities in
some years, but reveals that the agents overall earned far more
by way of commissions on the sale of non-AUL securities than on
the sale of all AUL products during the relevant time period.
The record is entirely silent on the sales of non-AUL non-
securities, but the parties do not dispute that such sales did
occur.  In particular, Ruggiero does not dispute that during the
effective term of his contract with AUL, he received "tens of
thousands of dollars" for selling the products of two particular
insurance companies: Lincoln Benefit Life Company, and Penn
Mutual Life Insurance Company and Penn Insurance and Annuity
Company.

Ruggiero began to wind down his agency in 2013.  That year,
he stopped recruiting career agents because the expenses of
running his agency exceeded his revenue.  He completely ceased
the operations of the agency in September 2014.  At that time,
he ended his relationship with AUL and became a financial
advisor with New England Financial, an affiliate of Metropolitan

Life Insurance Company.  Ruggiero represented that his work with New England Financial would be a continuation of his prior work, and has maintained the same business contact information throughout his tenure at AXA, AUL, and now at New England Financial.

## B. *Procedural History*

Ruggiero filed this action in Massachusetts Superior Court on October 9, 2013, asserting three counts against the defendants: (I) violation of the Massachusetts independent contractor law, Mass. Gen. Laws ch. 149, § 148B, by misclassifying Ruggiero as an independent contractor instead of an employee; (II) violation of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148, by imposing unlawful costs, expenses, and charges on Ruggiero; and (III) violation of the Massachusetts minimum wage law, Mass. Gen. Laws ch. 151, § 1, by paying Ruggiero less than minimum wage.  Ruggiero seeks statutory damages, treble damages, and attorneys' fees.

The defendants removed the case to federal court on the basis of diversity jurisdiction.  They thereafter answered the complaint and asserted counterclaims against Ruggiero to enforce the two promissory notes executed by him and held by AUL with an outstanding balance of $155,912.46.

Ruggiero has now filed a motion for partial summary judgment as to AUL's liability under Count I of his complaint. The defendants have responded by moving for summary judgment on all counts, but address only Count I in their briefing.[7] Presumably, this is because if they prevail on Count I, they must necessarily prevail on Counts II and III as well. *See* Mass. Gen. Laws ch. 149, § 148B(a) ("For the purpose of this chapter and chapter 151, an individual performing any service . . . shall be considered to be an employee under those chapters unless" he or she meets the criteria for an independent contractor).  Neither party moves for summary judgment on the defendants' counterclaims against Ruggiero at this time.

## II. DISCUSSION

### A.  *Standard of Review*

The purpose of summary judgment practice is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) (citation omitted).  Summary judgment is appropriate when, based on the pleadings, discovery,

---

[7] Because the defendants' motion pertains to both AUL and OneAmerica, and because I have the authority to grant summary judgment for the non-moving party where appropriate, I will consider Ruggiero's claim against both defendants together, rather than considering AUL's liability individually.

12

and disclosure materials in the record, "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). A "genuine" dispute is one that, based on the supporting evidence, "a reasonable jury could resolve . . . in favor of the non-moving party," and a "material" fact is one that has "the potential to affect the outcome of the suit under the applicable law." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996) (citations and quotation marks omitted).

When reviewing a motion for summary judgment, I view the facts "in the light most favorable to the non-moving party." *Zambrana-Marrero v. Suarez-Cruz*, 172 F.3d 122, 125 (1st Cir. 1999). If the moving party satisfies the burden of showing, based on evidentiary material, that there is no genuine issue of material fact, the burden shifts to the nonmoving party to demonstrate by reference to specific provable facts "that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) "[C]onclusory allegations, improbable inferences, and unsupported speculations" are insufficient to establish a genuine dispute of fact. *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

13

Where, as here, both parties have moved for summary judgment, I consider each motion "on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Bienkowski* v. *Northeastern Univ.*, 285 F.3d 138, 140 (1st Cir. 2002) (citation omitted); *see Mandel* v. *Bos. Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir. 2006). Summary judgment is appropriate if "either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Grp., Inc.* v. *Ferré Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001).

**B.  *Count I: The Massachusetts Independent Contractor Statute***

The Massachusetts independent contractor statute, Mass. Gen. Laws ch. 149, § 148B(a), "establishes a framework for determining whether a worker is an employee or an independent contractor" for the purposes of entitlement to the "benefits and rights of employment." *Depianti* v. *Jan-Pro Franchising Int'l, Inc.*, 990 N.E.2d 1054, 1066 (Mass. 2013) (quoting *Taylor* v. *E. Connection Operating, Inc.*, 988 N.E.2d 408, 413 (Mass. 2013)). The statute presumes that "an individual performing any service" is an employee and therefore is entitled to the benefits of the Massachusetts wage and overtime laws. *See id.* (quoting Mass. Gen. Laws ch. 149, § 148B(a)).

14

To rebut the presumption and classify an individual as an independent contractor, a putative employer must satisfy a three-prong test set forth in § 148B(a):

> An individual performing any service . . . shall be considered to be an employee . . . unless:
> (1)   the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and
> (2)   the service is performed outside the usual course of the business of the employer; and
> (3)   the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

Mass. Gen. Laws ch. 149, § 148B(a).  If the putative employer does not prove all three prongs, the individual must be classified as an employee.  *See Sebago* v. *Bos. Cab Dispatch, Inc.*, 28 N.E.3d 1139, 1146 (Mass. 2015); *Somers* v. *Converged Access, Inc.*, 911 N.E.2d 739, 747 (Mass. 2009).  In interpreting the statute, I rely in part on an advisory from the Office of the Massachusetts Attorney General, which the Massachusetts Supreme Judicial Court and, consequently, I find instructive.  *See, e.g.*, *Sebago*, 28 N.E.3d at 1149 ("Insofar as the Attorney General's office is the department charged with enforcing the wage and hour laws, its interpretation of the protections provided thereunder is entitled to substantial deference . . . ." (internal quotation marks and citation omitted)); *Martins* v. *3PD, Inc.*, Civ. Action No. 11-11313-DPW, 2013 WL

15

1320454, at *7, *13 & n.6 (D. Mass. Mar. 28, 2013). *See generally* An Advisory from the Attorney General's Fair Labor Division on M.G.L. c. 149 § 148B, 2008/1 ("Att'y Gen. Advisory"). Whether the defendant has carried its burden under § 148B(a) – on facts that are undisputed – is a question of law. *See Athol Daily News* v. *Bd. of Review of the Div. of Emp't & Training*, 786 N.E.2d 365, 370 (Mass. 2003).

As a threshold matter, it is necessary to identify what service Ruggiero provided to the defendants. *See Sebago*, 28 N.E.3d at 1148-49. It is undisputed that Ruggiero sold at least some insurance products on behalf of AUL. In addition, Ruggiero recruited, trained, and supervised career agents who also sold insurance products on behalf of AUL. With this in mind, I consider each prong of the independent contractor test.

1.   Prong One: Free of Control and Direction

a.   *Guiding Legal Principles*

Under the first prong, the defendants must demonstrate that Ruggiero was "free from control and direction in connection with the performance of the service." Mass. Gen. Laws ch. 149, § 148B(a)(1). Although an employment agreement can be instructive, the crux of the inquiry is in the *actual* relationship between the parties, and whether the plaintiff performs his work in fact "with minimal instruction." Att'y

16

Gen. Advisory at 3.  "The essence of the distinction under common law has always been the right to control the details of the performance . . . and the freedom from supervision 'not only as to the result to be accomplished but also as to the means and methods that are to be utilized in the performance of the work.'"  *Athol Daily News*, 786 N.E.2d at 371 (citations omitted).

      *b.   Analysis*

As a preliminary matter, I observe the language of the contract between the parties indicates that Ruggiero was free to perform his services as he desired.  The contract specifically classifies Ruggiero as an independent contractor and entrusts him "to exercise independent judgment as to the time, place, manner, and means in which he carries out his duties and responsibilities."  *But see Somers*, 911 N.E.2d at 748-49 (agreement between employer and individual as to status as employee or independent contractor does not govern).

The contract gives Ruggiero specific tasks: recruiting, training, developing, and supervising agents and brokers, and soliciting applications for insurance and annuity policies.  In performing these tasks, the contract requires that Ruggiero "maintain an office for the purpose of carrying out his duties and responsibilities," "pay all expenses of this office," keep

premium collections "separate and distinct from all other
funds," "keep a record of all business transacted," comply with
all applicable state and federal laws and regulations, and with
"the Company's published rules, regulations, policies, and
procedures respecting the conduct of its business, including but
not limited to, the Principles and Code of the Insurance
Marketing Standards Association," and "conduct himself as not to
affect adversely the business, good standing, or reputation of
himself or the Company."  Beyond that, the contract does not
prescribe how the requisite tasks are to be performed.  Indeed,
the contract leaves open to Ruggiero's discretion how to
advertise and market his agency and AUL's products, solicit
clients, sell the products, recruit and train agents, and run
the agency overall.  *Cf. Athol Daily News*, 786 N.E.2d at 371
(newspaper carriers were required to deliver papers "in good
condition and before a certain time each day," but otherwise
were free to deliver papers through any transportation means,
"to adopt any manner of dress or wrap the newspapers in any
way," "to perform services for their customers other than the
delivery of newspapers," expand routes, or receive assistance,
and therefore were free from control and direction of newspaper
company).

Ruggiero makes two main arguments in support of the contention he was not free from the control or direction of AUL. First, he asserts that being subject to AUL's rules, regulations, policies, and procedures, pursuant to the contract, limited his independence.  Read in a wooden fashion, the broad language in the contract might suggest that Ruggiero was subject to wide-ranging oversight by AUL.  But the inquiry I conduct requires an assessment of the actual relationship between the parties, not merely a theoretical one.  *See* Mass. Gen. Laws ch. 149, § 148B(a)(1); *see also Machado* v. *System4, LLC*, 28 N.E.3d 401, 411 (Mass. 2015) ("statutory language directs a look both at the worker's agreement, if any, as well as the actual working relationship").  As specific examples of AUL's oversight, Ruggiero argues that AUL required him to gain its approval for his promotional materials, website, and office signage, and required him to establish his agency as a limited liability corporation.  Ruggiero does not otherwise point to any particular policies AUL enforced that limited his freedom in running his agency.[8]

---

[8] The only policy Ruggiero cites is AUL's Code of Ethics, which contained a progressive disciplinary policy until May 2010. However, AUL has demonstrated that this disciplinary process was never used.

AUL contends that the branding requirements and the
requirement that Ruggiero establish his agency as a legal entity
– not necessarily as a limited liability corporation – were
attributable to federal securities laws applicable to Ruggiero
because of his status as an OAS registered representative.
These regulations could be interpreted as subjecting Ruggiero
not to AUL's control and direction, but rather to the oversight
of a regulatory agency.  *Cf. Santangelo* v. *N.Y. Life Ins. Co.*,
Civ. Action No. 12-11295-NMG, 2014 WL 3896323, at *9 (D. Mass.
Aug. 7, 2014) ("A company does not exercise the requisite
control necessary to create an employer-employee relationship
merely because it restricts the manner or means of their work in
order to comply with statutory and regulatory requirements."),
*aff'd*, No. 14-1912, 2015 WL 1534145 (1st Cir. Apr. 6, 2015);
*Sebago*, 28 N.E.3d at 1150 (restrictions on taxi drivers'
"appearance, cellular phone usage, ability to smoke, procedures
for obtaining or refusing passengers, standards for the
treatment of passengers, meter rates, and geographical areas of
operation" were imposed by municipal regulation governing
taxicabs, and not by defendant medallion owners or radio
associations; plaintiffs were otherwise free from control and
direction of defendants).

The recent decision by the Supreme Judicial Court in *Monell*
v. *Boston Pads LLC*, 31 N.E. 3d 60, 67-70 (Mass. 2015) suggests
that where a relationship as defined by regulation expressly
precludes the satisfaction of a prong of the independent
contractor statute, the independent contractor statute will not
govern.  In *Monell*, the Court addressed a conflict between the
Massachusetts real estate licensing statute and the independent
contractor statute that "[made] it impossible for a real estate
salesperson to satisfy the three factors required to achieve
independent contractor status" in light of the mandated level of
supervision and control over salespersons by real estate
brokers, and the restrictions on salespersons' other activities.
*Id.* at 67.  Despite the express conflict between the two
statutes, the Court observed that "[t]he exclusion of real
estate salespersons from independent contractor status clearly
was not intended by the Legislature," because the real estate
statute itself recognizes that a salesperson "may be affiliated
with a broker either as an employee or as an independent
contractor."  *Id.* at 68 (internal quotation marks omitted)
(citing Mass. Gen. Laws ch. 112, § 87RR).  The Court concluded
that "the independent contractor statute does not apply to real
estate salespersons," but left open the possibility – in
accordance with the express language of the real estate

licensing statute – that some other framework could apply to determine whether a real estate salesperson is an employee or an independent contractor. *Id.* at 69-70.

*Monell* accordingly recognizes that statutory schemes dictating the terms of a working relationship may have a preemptive effect on the application of the independent contractor statute if, by their terms, they defeat any given prong of the statutory test. It does not, however, stand for the proposition that whenever a regulatory scheme precludes the application of the independent contractor statute, the individuals subject to that regulatory relationship must be classified as employees. Instead, if the applicable statute did not intend to dictate the classification in derogation of the independent contractor statute, the general statutory test for independent contractor status would presumably continue to be used to classify the individual.

The relationship of a registered representative and a broker-dealer is no doubt highly regulated in a fashion similar in some respects to that addressed in *Monell*. However, the parties in this case have not meaningfully focused on the regulatory framework governing their relationship and have not argued that the regulatory scheme precludes the application of the independent contractor statute overall. Accordingly, I must

conduct the analysis here on the assumption that the regulatory scheme governing the particular relationship at issue and the Massachusetts independent contractor statute are capable of coexistence. AUL has not identified the particular laws or regulations imposing regulatory requirements, despite being given an opportunity to do so following the June 2015 hearing on this matter.[9] I must rule on the basis of the record and arguments before me, which at present demonstrate a genuine dispute whether the branding and entity formation requirements imposed by AUL on Ruggiero were required by law.

That does not save Ruggiero under this prong, however. Regardless of whether regulatory oversight might displace this prong of the general statutory independent contractor test, it is plain that the requirements for branding and corporate form do not meaningfully restrict = Ruggiero's "right to control the details of [his] performance," which is the crux of the inquiry under prong one. *See Athol Daily News*, 786 N.E.2d at 371; *see also Santangelo*, 2014 WL 3896323, at *9 (even if defendant were

---

[9]  It appears that as a registered representative, Ruggiero was subject to external regulation by FINRA, which imposes certain requirements pertaining to advertising and customer communications, among other areas, and further that OAS had supervisory responsibilities with regard to Ruggiero's activities in this capacity. But it is the responsibility of the parties to identify the relevant and material dimensions of such regulation and supervision. They have not done so here.

incorrect as to asserted legal compliance reasons for imposing certain requirements on plaintiffs, "none of the restrictions identified by plaintiff outweigh the overwhelming evidence that he was an independent contractor"). Rather, viewing the facts in the light most favorable to Ruggiero, these requirements at most dictate that Ruggiero was required to hold himself out as being affiliated with AUL, and to comply with certain markers of competence all deemed necessary in order to permit him to do so.

Although required branding could arguably be analogized to a uniform worn by a delivery worker, this one imposition, standing alone, is not enough to impinge significantly on Ruggiero's control of his operations. *See Athol Daily News*, 786 N.E.2d at 371 (test under prong one "is not so narrow as to require that a worker be entirely free from direction and control from outside forces" (internal quotation marks omitted)); *cf. Fucci* v. *E. Connection Operating, Inc.*, No. MICV 2008-2659, slip op. at 7-8 (Mass. Super. Ct. Sept. 24, 2009) (delivery company's provision of detailed daily work schedules with set pickup and delivery times, requirement that plaintiffs obtain vehicles sufficiently large to transport daily deliveries, and uniform requirement found sufficient to demonstrate that defendant "exercised a degree of control and direction over the plaintiffs' performance, both under their

Agreements and in fact"). Similarly, the corporate form requirement does not constitute any meaningful impingement upon Ruggiero's operation of his business in affiliation with AUL.

Ruggiero also argues that AUL supervised him and his performance under the contract through the office of its Chief Agency Officer. This office employs three agency vice presidents – previously two territorial vice presidents – who oversee and provide support to general agents. They and their staff conduct quarterly agency reviews and evaluate agents' performance overall. The territorial vice president assigned to Ruggiero, Jeff Pikus, contacted or met with Ruggiero thirty-five times over the course of three years to review his productivity, recruiting activities, and sales goals. However, there is no indication that Pikus directed Ruggiero's activities or exerted any control over his agency; the record discloses that he merely checked in on Ruggiero's progress, offered resources for continued success, and performed some measure of ad hoc quality assurance for AUL. That AUL was invested in the success of its agents does not mean that it controlled their work.

Apart from the limited actual oversight provided by AUL, Ruggiero had extensive flexibility in running his agency. Ruggiero himself acknowledged this freedom. He was free to sell the products of other companies, to provide his agents with

training on other products, to seek and advise clients however
he saw fit, to recruit agents however he chose, and to run the
agency as he desired.  In advising clients on which life
insurance policy to choose, Ruggiero would consider the benefits
to the specific client of various companies' products and would
take a "holistic approach" to the client's needs.  Although AUL
provided agents with minimum production requirements, and the
contract indicated that agents could not be general agents or
full-time employees of another insurance company, AUL did not
enforce the production requirements or interfere with Ruggiero
and his agents selling the products of competitors.  In
addition, although the contract gave AUL "the sole right to
determine when an agent or broker is under the recognized
supervision of the General Agent," Ruggiero in fact had ultimate
discretion in hiring; AUL never rejected a career agent that
Ruggiero proposed.[10]  AUL suggested termination of only one agent
and that was someone whom Ruggiero had already decided to
terminate.

---

[10] AUL represents in supplemental briefing that AUL reviewed the
agents Ruggiero recruited only in a ministerial manner in order
to ensure compliance with certain Massachusetts laws regarding
the formal appointment of insurance agents.  *See* Mass. Gen. Laws
ch. 175, §§ 162R(a), 162S(a).

In the context of applying a very similar "right to
control" test to determine if an individual is an employee or an
independent contractor for the purposes of federal and state
employment discrimination statutes, federal courts have
consistently found that insurance agents acting just as Ruggiero
did were independent contractors. *See, e.g.*, *Murray* v.
*Principal Fin. Grp., Inc.*, 613 F.3d 943, 944-45 (9th Cir. 2010)
("We, along with virtually every other Circuit to consider
similar issues, have held that insurance agents are independent
contractors and not employees for purposes of various federal
employment statutes . . . ."); *McAdams* v. *Mass. Mut. Life Ins.
Co.*, 391 F.3d 287, 290 (1st Cir. 2004) (general agents for
defendant insurance company were independent contractors because
they did not receive salary from defendant and did not have to
provide profit and loss statements, but did receive financial
support from defendant for rent and other expenses); *see also
Speen* v. *Crown Clothing Corp.*, 102 F.3d 625, 633 (1st Cir. 1996)
(clothing sales representative "was kept on a rather long leash,
if not actually allowed to run free in a rather large yard,"
with freedom to "decide[ ] where he went and how long he worked
on any particular day," and "[h]ow and in what order he covered
his territory"; he was "not required to carry anything, do
anything, or say anything in particular as he went about trying

27

to sell [defendant's] (and other) products," and was paid on commission); *Santangelo*, 2014 WL 3896323, at *8 (plaintiff "arranged his own meetings with clients, determined his own sales strategy and could sell products in any state in which he was licensed," "worked whatever hours he felt were appropriate on a given day and was not required to report to [defendant] on a daily basis," "did not have regularly scheduled meetings outside of the one annual sales training," "rented his own office space and bought his own supplies and office furniture," "was paid a commission rather than a salary," and "was free to sell the products of other life insurance companies and did so during the time he had a contract with [defendant]").

Although there are some indicia of loose direction in the record before me, in light of the autonomy Ruggiero exercised to run the day-to-day operations and dictate the long-term priorities of his agency, a reasonable fact finder could not conclude on this record that Ruggiero was subject to the type of control and direction by AUL that would indicate employee status.  Accordingly, the defendants have met their burden on prong one.

    2.   Prong Two: Usual Course of Business

        a.  *Guiding Legal Principles*

As is often the case in this area, the crux of the parties'

28

dispute is found in the second prong.  *See, e.g.*, *Awuah* v. *Coverall N. Am., Inc.*, 707 F. Supp. 2d 80, 82 (D. Mass. 2010); *Sebago*, 28 N.E.3d at 1150.  Under this prong, the defendants must prove that the service the plaintiff provides "is performed outside the usual course of the business of the employer." Mass. Gen. Laws ch. 149, § 148B(a)(2).

In assessing this prong, I consider "whether the service the individual is performing is necessary to the business of the employing unit or merely incidental," *Sebago*, 28 N.E.3d at 1150 (quoting Att'y Gen. Advisory) – that is, whether the individual "is performing an essential part of the employer's business." *Martins*, 2013 WL 1320454, at *14 (quoting Att'y Gen. Advisory). I look to how the putative employer holds itself out and to other indicia to determine the scope of its business.  *See id.* at *13-14; *Sebago*, 28 N.E.3d at 1150; *see also Sagar* v. *Fiorenza*, No. 12-CV-4081-F, 2014 WL 3697090, 32 Mass. L. Rptr. 191, at *3 (Mass. Super. Ct. July 4, 2014).

        *b.  Analysis*

Ruggiero provides two related services for the defendants: selling AUL's products and recruiting and training career agents who also sell AUL's products.  Because these are distinct services, I consider each in turn.

i.  Sales of AUL's Insurance Products

I begin with the defendants' own public-facing definition of its business, which "is indicative of the usual course of that business." *Sebago*, 28 N.E.3d at 1150.  OneAmerica's website states that AUL "offers a comprehensive portfolio of products for individuals, families, and businesses."  Although Ruggiero points to statements in OneAmerica's annual report and on its website emphasizing that its "focus is on our customers," OneAmerica does not present itself as actually selling the insurance and financial products it offers.  Instead, it educates consumers about its products and indicates that it "provides local service through a national network of experienced financial professionals."  OneAmerica's website states that "[f]inancial professionals at General Agencies work to bring you our life insurance policies and annuities designed to meet the needs of individuals, families and small business clients."  Its annual report further states that "[o]ur trusted and skilled financial professionals recognize OneAmerica as a valuable partner to help them grow their practice. . . . [W]e provide the tools to help them better develop customized strategies aligned with your financial goals."

The website and other materials suggest that the defendants' primary business function is the provision of

30

insurance products.  To be sure, sales are essential to AUL's success.  But AUL makes clear that it is not in the business of *selling* insurance products directly; it is in the business of determining which products to make available, structuring and drafting the policies, obtaining regulatory approval for these policies, and investing the policy premiums.  For this reason, it employs underwriting specialists and actuaries who determine pricing and premium rates, conduct financial reporting and modeling, and assess risk.  It also employs individuals tasked with overseeing AUL's relationships with agents who conduct direct consumer sales.

To demonstrate that retail sales must be essential to and within the usual course of its business, Ruggiero emphasizes that OneAmerica made $2.4 billion in 2013 from sales of its products.  AUL, for its part, asserts that this economic value is essentially derived from its writing of policies that obtain regulatory approval and are perceived as being of value to both agents and consumers.  I agree with the defendants that providing information about and fashioning a product one manufactures is not the same as being in the business of directly selling it.  Indeed, many product manufacturers educate consumers about their products without engaging in direct retail sale.  This distinction is supported by evidence presented by

the defendants that within the insurance industry, there is a recognized division between producing an insurance product (an insurance carrier) and selling it (an insurance brokerage or agency).

It is important to this analysis that OneAmerica could still produce insurance products without general agents such as Ruggiero. As critical as sales ultimately are to OneAmerica's financial stability, at its core, OneAmerica manufactures — rather than sells — a product. Any manufacturing business is, of course, dependent on such ancillary functions as product sales and advertising. But this dependency does not automatically incorporate the ancillary functions into the usual course of the manufacturer's business. As the Supreme Judicial Court has observed:

> One may . . . be engaged in a business that cannot be conducted unless he . . . can ship the finished product to the various markets. It is hard to imagine a business that is not dependent in some way upon transportation. In such instances, while transportation is a necessity, it does not thereby become a part of or a process in the business but it continues as ancillary and incidental thereto.

*Sebago*, 28 N.E.3d at 1152 (quoting *Cannon* v. *Crowley*, 61 N.E.2d 662, 665 (Mass. 1945)).

This manufacturing-sales dichotomy may seem formalistic, but it is grounded practically in business arrangements where

the manufacturer does not engage in direct sales but instead empowers individuals to engage in their own, separate businesses that involve — but do not consist exclusively of — the sale of the manufacturer's products.  To be sure, as the Supreme Judicial Court has made clear, an artificial deconstruction of business operations "into component parts" using "illusory distinctions" may not be used "to avoid the strictures of the Wage Act." *Sebago*, 28 N.E.3d at 1155.  But where a business has legitimately defined the boundaries of its operations, and outsourced functions it considers to be beyond those boundaries to "separately defined" businesses or third parties, *id.* at 1153, the independent contractor statute cannot be used to expand those boundaries.  *Id.* at 1155.

Although the parties do not cite any case addressing this type of relationship – a defendant who manufactures and administers insurance policies, and a plaintiff who offers consumers the opportunity to purchase those policies – the case law suggests the conclusion that such sales activity is not within the usual course of the defendant's business.

Two categories can be discerned from the case law:  on the one hand, there are cases in which the defendants equip the plaintiffs with the tools, resources, and opportunity to sell or provide the defendants' products, often earning a commission or

percentage of the sales, and essentially franchising their business; and on the other, there are cases in which the defendants merely give the plaintiffs a license or a product and leave the plaintiffs to their own devices to make a profit from it.  *Compare Martins*, 2013 WL 1320454, at *14 (delivery company held itself out publicly as a delivery company and contracted directly with customers to provide services; plaintiffs performed "a vital and necessary aspect of its business" by providing "the delivery services that, both internally and publicly, appear to form the foundation of its business"); *Awuah*, 707 F. Supp. 2d at 82, 84 (rejecting argument that franchising is in itself a business, and concluding that cleaning franchisor engaged in same business of commercial cleaning as cleaners themselves); *DeGiovanni* v. *Jani-King Int'l, Inc.*, Civ. Act. No. 07-10066-MLW, hearing tr. at 81 (D. Mass. June 6, 2012) (commercial cleaning company engaged in same business as janitorial workers because company held itself out as a leader in commercial cleaning, and contracted directly with customers to provide cleaning services); *Oliveira* v. *Advanced Delivery Sys., Inc.*, 2010 WL 4071360, 27 Mass. L. Rptr. 402, at *6 (Mass. Super. Ct. July 16, 2010) (defendant in business of providing home furniture delivery management services to furniture retailers in same business as individuals who make

34

furniture deliveries); *Chaves* v. *King Arthur's Lounge*, Civ. Action No. 07-2505, slip op. at 7 (Mass. Super. Ct. Aug. 7, 2009) (exotic dancer worked in course of business of adult entertainment lounge); *and Rainbow Dev., LLC* v. *Dep't of Indus. Accidents*, No. SUCV2005-00435, 2005 WL 3543770, at *3 (Mass. Super. Ct. Nov. 17, 2005) (individuals who provide detailing and conditioning services for cars were engaged in same business as defendant that administered and coordinated these services; "[w]ithout the services of the workers, [defendant] would cease to operate"); *with Sebago*, 28 N.E.3d at 1151 ("the medallion owners' leasing business is not directly dependent on the success of the drivers' endeavors" because owners "are not concerned with the results of the plaintiffs' operations, as drivers are not required to remit a percentage of their revenues, which include both fares and tips"; drivers only contribute "incidentally" to owners' advertising revenues); *and Kubinec* v. *Top Cab Dispatch, Inc.*, No. SUCV201203082BLS1, 2014 WL 3817016, at *10-13 (Mass. Super. Ct. June 25, 2014) (defendant taxi dispatch service not in same business as taxi drivers).

These cases demonstrate that management or administration of the provision of services and the performance of those same services are considered to be the same course of business. *See,*

*e.g.*, *Oliveria*, 2010 WL 4071360, at *6.  But they leave room for the conclusion that the manufacture of a product is not necessarily the same course of business as selling or using that product to make a profit.  AUL's operation here is qualitatively different from those of the delivery and cleaning companies, the adult entertainment lounge, and even the taxi medallion and dispatch companies discussed above, because without sales of the insurance products through agents like Ruggiero, AUL would still have a product and other mechanisms by which to profit from it.

On the record before me, a reasonable fact finder could not find that AUL was in the business of selling insurance products. Ruggiero has not pointed to any evidence that AUL or OneAmerica actually sells the products it manufactures.  The defendants' creation and administration of insurance products is "only incidentally dependent" on the sale of them by general agents. *Cf. Sebago*, 28 N.E.3d at 1152.

Even if sales were an essential part of AUL's business, it cannot be said that AUL's business is "directly dependent on the success of [Ruggiero's] endeavors." *Sebago*, 28 N.E.3d at 1151. Although this case bears indicia similar to those cases in the first category described above – a defendant who benefits financially with each of the plaintiff's sales, and who invests in the plaintiff's success – it has two important distinctions

36

(leaving aside a third – that the plaintiff and the defendant are engaged in discretely different businesses — as discussed above).

First, there is some evidence that AUL could and did facilitate the sale of its products through methods other than general agents. Ruggiero contends that AUL products are sold primarily through general agents, but offers no persuasive support for this assertion other than the existence of a unit at AUL dedicated to overseeing general agents. AUL asserts that general agents are not the primary vehicle, but rather that certain AUL products sold by general agents are also sold by banks, credit unions, investment firms, and wholesalers. Other products – namely, term life or certain whole life or fixed annuity products – are not sold through these other mechanisms, but could be if AUL chose to do so. Whether these products could be sold by any number of entities is relevant, and a reasonable fact finder would be free to credit or discredit the testimony offered by the parties to assess whether sales through one mechanism would be as beneficial to AUL or as feasible as sales through another. I may not make such credibility determinations at the summary judgment stage. However, there is another reason why, as a matter of law, Ruggiero's sales services cannot be considered essential.

There is ample evidence, as discussed in relation to the other prongs, that Ruggiero's activities benefited AUL but also benefited other similar insurance companies. *See Sebago,* 28 N.E.3d at 1151 ("the second prong should not be construed to include all aspects of a business such that [the first and third] prongs . . . become unnecessary" (alterations in original, internal quotation marks omitted) (quoting Att'y Gen. Advisory)). An incidental contribution to the defendant's revenues is just that – incidental. *See id.*

General agents come in all varieties and offer different levels of commitment to and enthusiasm for a given company's products. Within this broad universe of general agents, it cannot be said that AUL is dependent on the success of an agent like Ruggiero who, the evidence demonstrates, primarily sells the products of other insurance companies. Ruggiero is not just pitching AUL products; he is comparing AUL products with its competitor's products to determine which one is right for a particular customer. That comparative process is plainly not essential to AUL's business, particularly when it results – most of the time with respect to Ruggiero personally – in the sale of a competitor's product.

Although, as a general matter, the second prong is focused on the defendants' usual course of business, in this case it is

38

relevant that Ruggiero's business was not entirely dedicated to
the sale of AUL products.  Although Ruggiero followed some AUL
direction in terms of how to market himself, Ruggiero was
engaged in the business of selling a wide variety of insurance
products, only a small percentage of which were AUL products.
Where Ruggiero brought in minimal business for AUL, it surely
cannot be said that his services were critical to AUL's
business.  Indeed, as will be made clearer in the discussion of
prong three below, AUL's business and Ruggiero's business are
"independent, separate and distinct" operations.  *Am. Zurich
Ins. Co.* v. *Dep't of Indus. Accidents*, No. 053469A, 2006 WL
2205085, 21 Mass. L. Rptr. 224, at *12 (Mass. Super. Ct. June 1,
2006).

Here, Ruggiero gave independent advice to customers he
developed on his own – many before he became affiliated with AUL
– and sold primarily non-AUL products (more than 95% of the
time).  To be sure, general agent relationships undoubtedly
benefit the principal when a sale is made.  It is undisputed
that AUL derived a benefit each time Ruggiero or one of his
agents sold an AUL product, because it received the customer's
premium and investment, and had to pay only a portion to
Ruggiero for obtaining the sale, and that OAS earned some
commission as broker-dealer each time Ruggiero (or one of his

agents) sold a non-AUL security.  *Cf. Kubinec*, 2014 WL 3817016, at *10-13 (defendant taxi dispatch service received only incidental benefit when plaintiff accepted a dispatch from it because defendant's "dispatches constituted only approximately 9.95% of all fares driven" by dispatch's agents in given year, and because defendant "received only the same weekly payment from its members regardless of whether dispatches were accepted or passengers simply hailed member cabs from the street").  It is also undisputed that the contract between Ruggiero and the defendants suggested a level of exclusivity by prohibiting Ruggiero from serving as a general agent or full-time employee of another insurance company, but that in reality both parties knew that Ruggiero would offer a wide variety of insurance products to his customers.

For the reasons discussed above, however, an agent will not be considered an employee of a company simply because he makes sales that benefit the company.  On these particular facts, it cannot be said that AUL was "directly dependent on the success of [Ruggiero's] endeavors," *Sebago*, 28 N.E.3d at 371, when his endeavors included AUL's interest in so limited a manner.  *Cf. Gotchis* v. *Allstate Ins. Co.*, Civ. A. No. 90-12553-Y, 1993 WL 795440, at *3 (D. Mass. Feb. 19, 1993) ("independent contractors who solicit business on behalf of any number of companies

. . . . solicit for themselves, choosing the insurance carrier that best suits their clients' needs," and in so doing insurance agent "solicits on behalf of his own agency and is therefore regarded as the owner of his expirations"). Ruggiero's sales services were "merely incidental" to AUL's business. *See Sebago*, 28 N.E.3d at 1150 (quoting Att'y Gen. Advisory).

ii. Recruiting and Training Career Agents

I reach the same conclusion with respect to Ruggiero's services in recruiting and training career agents and brokers. In supervising career agents and brokers, Ruggiero was acting in his own interest, because he would receive a commission for the sales attributable to these agents and brokers. Ruggiero's services were in the interest of AUL only to the extent that they generated sales of AUL products, and it is evident that not all sales by career agents involved AUL products. Moreover, if such sales are not in any event an essential component of the defendant's business, then the recruiting, training, and supervision of career agents – one of many types of sales agents available to AUL – surely is not essential.

It is undisputed that AUL has a unit dedicated to overseeing agents, and specifically to liaising with general agents and equipping them with resources to recruit and train career agents and brokers. As discussed above, the unit is led

41

by a Chief Agency Officer, who oversees three agency vice presidents (previously two territorial vice presidents) and other employees who assess the productivity of the general agents on a regular basis.  The territorial vice president assigned to Ruggiero had regular communications with him to check in on his progress on performance and sales goals.  There is no evidence on whether AUL maintained similar units for overseeing other retail sales mechanisms.  This arrangement might be viewed as providing some support for Ruggiero's position that it was part of the usual course of the defendant's business to supervise and train agents – a task that Ruggiero himself undertook.  Again, however, the specific facts of Ruggiero's operation belie his argument.  AUL's agency unit was focused on equipping agents with tools and resources to sell — and arguably providing some quality control on the sales of — AUL products.  The training Ruggiero provided to his agents – and indeed, the sales he and his agents obtained – went far beyond AUL products and focused primarily on those of other insurance carriers.

Given that Ruggiero and his agents maintained relationships with numerous other insurance companies, and that they sold the products of other insurance companies with far greater frequency

than they sold AUL products,[11] it is evident that the benefit to AUL was merely incidental to Ruggiero's work in recruiting and training insurance agents.  The activities of these agents were directed primarily toward benefitting Ruggiero and the agents themselves.

Indeed, Ruggiero worked out individually with each agent how they would split the commission on the agent's sales, and further required them to enter into agreements with Crump, through which they made the majority of their sales.  Had Ruggiero's team sold only or primarily AUL products, such that Ruggiero was essentially performing a training and supervisory function that would otherwise have to be performed by AUL, then the result may be different.  To this end, Ruggiero argues that more than half of the commissions of several of his agents were attributable to sales of AUL products in certain years, and that he himself spent more than ninety percent of his time training agents.  But clearly Ruggiero's training encompassed numerous products and was not limited to those of AUL.  How much time Ruggiero spent recruiting, training, and developing agents with

---

[11] This conclusion can be drawn from the commission data regarding the agents' overall sales of AUL products compared to non-AUL securities.  Any sales of non-AUL securities — which are not reflected in this data, but which indisputably occurred — would serve only to increase the percentage of non-AUL product sales

a specific eye toward AUL product sales, and how much time those agents ultimately dedicated to making these specific sales, cannot be determined with precision from the record before me. Such parsing, however, is unnecessary in this case.

Where the record makes clear that the sale of non-AUL products — including non-AUL securities, for which OAS received only an incidental benefit — was a significant component of the work of Ruggiero's agents, it cannot be said that Ruggiero's activities in recruiting and supervising agents were necessary to AUL's business.

In sum, the defendants have met their burden on prong two.

### 3.   Prong Three: Independently Established Business

####     a.  *Guiding Legal Principles*

Under the third prong, the defendants must demonstrate that the plaintiff "is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed."[12]   Mass.

---

[12] The defendants ask preemptively that I invoke the doctrine of judicial estoppel to prevent Ruggiero from contending now, contrary to his earlier representations in this litigation, that the third prong of the test is not satisfied. *See Alt. Sys*. *Concepts, Inc*. v. *Synopsys, Inc*., 374 F.3d 23, 28-29 (1st Cir. 2004).  In an earlier filing, Ruggiero stated: "As made clear in the Complaint, Plaintiff is only challenging his misclassification as an independent contractor under the first and second criterion of section 148B."  In challenging the defendants' motion to compel certain discovery, Ruggiero argued

Gen. Laws ch. 149, § 148B(a)(3).  "The critical inquiry under this prong is whether 'the worker is capable of performing the service to anyone wishing to avail themselves of the services or, conversely, whether the nature of the business compels the worker to depend on a single employer for the continuation of the services.'"  *Sebago*, 28 N.E.3d at 1153 (quoting *Athol Daily News*, 786 N.E.2d at 373).  In the case law, the line is drawn between "the worker [who] is wearing the hat of an employee of the employing company" and one who "is wearing the hat of his own independent enterprise."  *Oliveira*, 2010 WL 4071360, at *7 (quoting *Bos. Bicycle Couriers, Inc*. v. *Deputy Dir. of the Div. of Emp't & Training*, 778 N.E.2d 964, 970 (Mass. App. Ct. 2002)).

 *b.  Analysis*

 As discussed at length above, the undisputed evidence demonstrates that Ruggiero established an agency that sold the insurance products of both AUL and a number of other competing companies.  Although the contract between Ruggiero and AUL by terms prohibited Ruggiero from serving as a general agent or

---

that the requested information spoke "solely to the third criterion of section 148B, which is not at issue here."  While I find the doctrine of judicial estoppel applicable here, in the interest of completeness I will discuss why the undisputed evidence clearly establishes that this prong is satisfied even without the plaintiff's admission.

full-time employee of another insurance company, this did not prevent Ruggiero from selling other products.  In fact, Ruggiero had relationships with other insurance companies, including a wholesaler – Crump – through which he and his agents made a significant portion of their sales, despite also presenting themselves as AUL agents by carrying AUL's name on their promotional materials and correspondence.  *Cf. Amero* v. *Townsend Oil Co.*, No. 071080C, 2008 WL 5609064, 25 Mass. L. Rptr. 115, at *3 (Mass. Super. Ct. Dec. 3, 2008) (plaintiff was not "customarily engaged in an independently established business of the same nature as the service being provided" because he "did not provide fuel oil delivery services to anyone independent of [defendant], nor could he have given the non-competition agreement [defendant] required him to sign").  The sale of competing products is an important indicium of an independent operation.[13]  *Cf. Sebago*, 28 N.E.3d at 1153 (drivers were free to "lease taxicabs and medallions from whoever they wish," and could lease each day "from a different owner, each using a

---

[13] I note that whether an insurance agent sells primarily or exclusively one insurance company's products — as opposed to representing several companies — determines whether a life insurance sales agent must be treated as an employee of the insurer for tax purposes.  *See I.R.C.* §§ 3121(d)(3)(B), 7701(a)(20); *see also Eagan* v. *United States*, 80 F.3d 13, 15 (1st Cir. 1996).

different radio association"); *Athol Daily News*, 786 N.E.2d at 374 (carriers were not limited to delivering only defendant's newspapers; instead, they used their own vehicles and bought newspapers from defendant for resale at price of their choosing, and they could [and did] engage in their own independent enterprises involving the provision of other services or the delivery of other newspapers, "even competitors of the News"); *Comm'r of Div. of Unemployment Assistance* v. *Town Taxi of Cape Cod, Inc.*, 862 N.E.2d 430, 436 (Mass. App. Ct. 2007) (drivers were free to "open their own taxi service or drive for another service," and "to find customers on their own and reject prospective customers referred from the dispatcher").

As further evidence that Ruggiero had an independent business, I note he has employed the same business phone number at AXA (his previous employer), at the agency he created to work with AUL (RIFS), and now at New England Financial after ending his relationship with AUL.  Ruggiero informed his clients of his transition to New England Financial and, it can be inferred, has continued to work with some of them there.  These are strong indicia that Ruggiero "is capable of performing the service to anyone wishing to avail themselves of the services" and not simply through his relationship with AUL.  *See Athol Daily News*, 786 N.E.2d at 373.

It is clear that Ruggiero was "an entrepreneur operating an independently established business," *Oliveira*, 2010 WL 4071360, at *7, albeit with the financial support and imprimatur of AUL. Indeed, it was this desire to operate independently that he concedes led him to partner with AUL as opposed to another insurance company.  *See Town Taxi*, 862 N.E.2d at 436 (emphasizing "'entrepreneurial' spirit . . . exhibited by a typical independent contractor").  For these reasons, the defendants have met their burden on prong three, and accordingly have satisfied the test for an independent contractor under Mass. Gen. Laws ch. 149, § 148B.

## C.   *Counts II and III*

Counts II and III of Ruggiero's complaint are premised on the conclusion that he is an employee under Mass. Gen. Laws ch. 149, § 148B, and therefore entitled to the protections of the Massachusetts Wage Act and the Massachusetts minimum wage law. Because I find, as a matter of law, that the defendants have satisfied all three prongs of the independent contractor test as to Ruggiero, there is no basis for the remaining counts. Accordingly, I will grant the defendants' motion for summary judgment on counts II and III as well.

48

### III. CONCLUSION

For the reasons set forth above, I DENY the plaintiff's motion for partial summary judgment, Dkt. No. 37, GRANT the defendants' motion for summary judgment, Dkt. No. 53, and GRANT the defendants' motion for leave to file an additional affidavit, Dkt. No. 80.  The parties shall submit a status report on or before October 16, 2015 proposing means to bring this matter to final judgment through resolution of the defendants' counterclaims.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE